# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **CHRIS HAULMARK**, | ) | |
| Plaintiff, | ) | |
| V. | ) | |
| **CITY OF WICHITA**, | ) | |
| and | ) | Civil Action No.  _21-1182-EFM-TJJ__ |
| **BRANDON WHIPPLE**, in his official | ) | |
| capacity as the Mayor of the | ) | |
| City of Wichita, | ) | |
| Defendants. | ) | |
| _____ | ) | |

### PLAINTIFF HAULMARK'S RESPONSE AND MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

As a pro se litigant, Chris Haulmark respectfully files an opposition to the Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment. (Docket No. 44) and the Defendants' Memorandum in Support (Docket No. 45) (hereinafter "Defendants' Memo"). In support of his Opposition, Plaintiff Haulmark submits the following statements, exhibits, and the legal authorities:

### I.     NATURE OF THE MATTER BEFORE THIS COURT

The heart of the original complaint alleges that the named Defendants City of Wichita (hereinafter "Defendant City" or "City") and Brandon Whipple (hereinafter "Defendant Whipple") have been aggressively refusing to take the legally-required steps to prohibit discrimination against Plaintiff Chris Haulmark and other individuals with hearing disabilities. (Docket No. 1 at 1) (hereinafter "Complaint"). In reviewing the

following facts, it is evident that the Defendants intentionally exclude Plaintiff Haulmark from services, programs, and activities of the City, deny him the benefits offered by its mayor, and intentionally discriminate against him because of his hearing disability.

The City offers the services, programs, and activities to the public through itself and its mayor when sharing announcements, responding to inquiries, providing vital health updates, dealing with ordinances and local regulations, and discussing important city matters.

Although Defendant Whipple is clothed with the status of mayor, he requests the public to listen to him on his campaign's Facebook page regarding the COVID-19 pandemic and other issues concerning the City. He leaves the Deaf population entirely on their own, disregarding their need for effective communication access to critical health and safety information pertaining to the pandemic and other health concerns, rather than making the speech and activities of the mayor's office on a campaign's Facebook page accessible as required by Title II of the ADA (hereinafter, "ADA" or "Title II"). As a consequence, the City is complicit in Defendant Whipple's discrimination against the Deaf population, signaling that the lives of the Deaf residents of Wichita are not valued and equal to those of their non-Deaf peers. Due to his disability, Plaintiff Haulmark is not able to access the government information provided through this campaign's Facebook page and share it with the Deaf community in American Sign Language.

It is clear, *inter alia*, that effective communication is not established with Plaintiff Haulmark and other individuals with hearing disabilities as required under

Title II of the ADA for the majority of the City's online videos published on its social media platforms.

## II.    RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

1.    Paragraphs 1-14 are admitted.

## III.    PLAINTIFF HAULMARK'S SET OF ADDITIONAL UNCONTROVERTED FACTS

## A.    Background

15.    City of Wichita is a public entity. (¶ 12 in Complaint; ¶ 9 in Docket No. 7) (hereinafter "Wichita's Answer")

16.    A claim against an official capacity involves a claim against the person's office. The lawsuit against Defendant Whipple is only against him in his official capacity as mayor. (¶ 11 in Complaint)

17.    The City administers the City of Wichita Facebook page[1], with over 44 thousand followers. (¶ 5 under Statement of Undipsuted [sic] Material Facts in Defendants' Memo; Exhibit #2)

18.    The City administers Mayor of City of Wichita Facebook page[2], with a little over 800 followers. ((1) of the ¶ 4 under Statement of Undipsuted [sic] Material Facts in Defendants' Memo; Exhibit #3)

19.    The City administers City of Wichita YouTube Channel[3], with over 2,350 subscribers. (¶ 5 under Statement of Undipsuted [sic] Material Facts in Defendants' Memo and Screenshot of City of Wichita YouTube channel (Exhibit #4).

---

[1] Facebook Page of City of Wichita-Government, https://www.facebook.com/cityofwichita
[2] Facebook Page of Mayor of Wichita, https://www.facebook.com/mayorofwichita
[3] YouTube Channel of City of Wichita, https://youtube.com/c/CityofWichita455

20.     Defendant Whipple administers his campaign's Facebook page[4] (hereinafter "Campaign Facebook page"), with over 10,000 followers. ((3) of the ¶ 4 under Statement of Undipsuted [sic] Material Facts in Defendants' Memo; Exhibit #5)

21.     Because Plaintiff Haulmark engaged Defendant Whipple on his campaign's Facebook page, the City of Wichita had been on notice of Plaintiff Haulmark's disability and a pattern of discrimination against individuals with hearing disabilities following the wake of the COVID-19 pandemic. (¶ 14 in Exhibit #1) (hereinafter "Haulmark's Affidavit")

22.     Real-time captioning of Facebook Live videos is possible. (Exhibit #6)

23.     Plaintiff Haulmark emailed to the Kansas Commission for the Deaf and Hard of Hearing while carbon copying to Defendant Whipple. (Exhibit #7).

24.      Defendant Whipple was notified by the Kansas Association of the Deaf about the inaccessible videos as his weekly briefings. (Exhibit #8).

**B.     Chris Haulmark**

25.     Plaintiff Haulmark is a qualified individual with a disability pursuant to Title II. (¶¶ 4, 77 in Complaint; ¶¶ 8, 29 in Wichita's Answer; ¶ 4 in Haulmark's Affidavit.)

26.     Plaintiff Haulmark is a qualified member of the public, pursuant to Title II, to participate in the services, programs, and activities offered by the Defendants. (¶ 77 in Complaint; ¶ 29 in Wichita's Answer; ¶¶ 6-13 in Haulmark's Affidavit)

27.     For the purpose of providing information in American Sign Language to the Deaf population as a political activist, Plaintiff Haulmark seeks benefits that are

---

[4] The campaign's Facebook Page of Defendant <u>Brandon Whipple</u>, https://www.facebook.com/VoteWhipple

offered to the public by the Defendants in the form of up-to-date information about the City's affairs, its activities, and its responses to the public. (¶¶ 11-13 in Haulmark's Affidavit)

**C.    Policies, Practices, and Procedures**

28.    The Defendants did not supply any "posted ADA notices, self-evaluation plans, transition plans, and grievance procedures." (Request No. 2 in Exhibit #10; Exhibit #11)

29.    The Defendants did not supply any "policies, procedures, and practices detailing how individuals with hearing disabilities are provided equal opportunity to benefit from the aural information shared in the online videos on the Defendants' social media platforms." (Request No. 10 in Exhibit #10; Exhibit #11)

30.    Seven days after he was elected mayor, Defendant Whipple informed and invited the public to his campaign's Facebook page through the City of Wichita's YouTube channel. (259-265 in Exhibit #16).

31.    A stay in order was issued by Sedgwick County Commissioners on March 24, 2020, directing individuals, residing in Sedgwick County, to stay home and leave their residence only for listed essential activities starting on March 25, 2020. (Exhibit #12)

**D.    Campaign's Facebook page used by Defendant Whipple**

32.    Defendant Whipple posted a pre-recorded video on March 18, 2020 on his campaign's Facebook page calling for the public to tune into his campaign's Facebook page for updates while he perform his mayor duties from home. (See Exhibit #17 and ¶ 53 below)

33.     As shown in screenshot taken on July 27, 2021 by Plaintiff Haulmark, Defendant Whipple presented his Facebook page to the public with the badge of "Public Official" on his Facebook Page that identifies him as "Wichita Mayor, KS". (First Screenshot in the Exhibit #13)

34.     This badge of "Public Official" was in place on Defendant Whipple's Campaign Facebook page under his name at the top right corner when he went live to discuss with the public on July 31, 2021, four days after Plaintiff Haulmark filed this lawsuit against him and the City. (The last two Screenshots in the Exhibit #13)

35.     Through his live streaming videos, Defendant Whipple solicited questions about anything including those about City's matters. (¶ 14 in Haulmark's Affidavit)

36.     Defendant Whipple arranged for his mayoral office to work from home and to utilize the Facebook page of his campaign with his official duties as the mayor. (See ¶ 80 below; ¶ 14 in Haulmark's Affidavit)

37.     Just as on City's Facebook page, Defendant Whipple introduces himself as the mayor of the City of Wichita on his campaign's Facebook page. (See ¶ 14 in Haulmark's Affidavit)

38.     On his campaign's Facebook page, Defendant Whipple has and continues to act in his official capacity for the purpose of representing and communicating about the City's updates, policies, programs, and actions while working from outside of the office as the mayor. (See ¶ 11 in Complaint; See ¶ 14 in Haulmark's Affidavit; and ¶¶ 51-81 below)

39.     Members of the public are addressing Defendant Whipple on his campaign's Facebook page as he is the mayor. Several of them commented and asked

questions about the City. Defendant Whipple responded to the public's statements and questions in a way made possible only by his inside knowledge of the city as the mayor. (See ¶ 14 in Haulmark's Affidavit)

40.     The benefits as what the public are receiving from the City's mayor on the campaign's Facebook page as the information about City's policies, programs, and actions are not provided on any other social media platforms administrated by the City. (¶ 15 in Haulmark's Affidavit)

41.     The Mayor of City of Wichita Facebook page only has at least 15 videos while Defendant Whipple's Campaign Facebook page has at least 60 videos. (Exhibit #14 and #15)

42.     Videos offering same municipal benefits that the public already have been taking advantage of that are published on Defendant Whipple's Campaign Facebook page are not available on the City of Mayor Facebook page. (See Exhibit #14 and #15 to compare)

43.     As soon as Defendant Whipple began to create Facebook Live videos on his campaign's Facebook page, there were not any reasonable accommodations provided for these videos. Plaintiff Haulmark repeatedly commented, asking for reasonable modifications that would allow him to receive the same benefits as what the individuals without hearing disabilities are receiving from the City's mayor. (¶¶ 15-16 in Haulmark's Affidavit)

44.     Plaintiff Haulmark addressed all of his comments concerning the violations of ADA laws to Defendant Whipple being the mayor of the City on the

campaign's Facebook page just like anyone else who were interested to address the mayor when discussing about the city's matters. (¶ 16 in Haulmark's Affidavit)

45.     Aside from ADA matters, Plaintiff Haulmark did not express any personal views, beliefs, or thoughts on the campaign's Facebook page. (¶ 17 in Haulmark's Affidavit)

46.     While Plaintiff Haulmark's comments on the campaign's Facebook page are protected activity under the ADA, Plaintiff Haulmark has not violated any laws, policies, or rules. (¶ 17 in Haulmark's Affidavit)

47.     Plaintiff Haulmark has been refused or denied the requested accommodations on the campaign's Facebook page. (¶ 18 in Haulmark's Affidavit)

48.     Plaintiff Haulmark's comments were removed from the campaign's Facebook page for discriminatory reasons. (¶ 18 in Haulmark's Affidavit)

49.     Plaintiff Haulmark has been restricted from making any comments because of his hearing disability. (¶ 18 in Haulmark's Affidavit)

50.     After filing his complaint in this lawsuit, Plaintiff Haulmark has been barred from accessing the content on the campaign's Facebook page in retaliation. (¶ 18 in Haulmark's Affidavit) (Exhibit #19)

**E.     Instances of Defendant Whipple Performing His Official Duties as the Mayor on His Campaign Facebook Page.**

51.     February 21, 2020. Defendant Whipple introduced himself as "your mayor brandon whipple" when live streaming from his office and discusses how Spirit layoffs were announced unexpectedly. (3-10) Furthermore, he discusses about the modernization of the "position of mayor" so he can be "out in the community and is serving the needs of the public". (20-24) He asks for "getting input and feedback from

people like you". (24-27) He shares that he wants to "hear from people like you" at the end of this video. (36) (Exhibit #22)

52.     March 12, 2020. Defendant Whipple, while seated in his office, posted a live video on on his campaign's Facebook page introducing himself as "your mayor brandon whipple". (3) He discusses what the City is doing about the incoming Coronavirus pandemic and that there is going to be a meeting in his office to "discuss further action" on what the City's staff plan to do. (4-15) He adds that there will be "another message in the next 24 hours to update you on a city's response we want to make sure that everyone stays up to date and knows what's going on with our city". (14-22) (Exhibit #23)

53.     March 18, 2020. Defendant Whipple posted a pre-recorded video with embedded captioning introducing himself as "your mayor". (3) He "just want to give you an update that i will be working from home for today and possibility for the next few days". (3-4) He continues to share information about the health of other council members and himself. (5-12) He closes the video off with "please stay following my social media stay to stay up to date". (12-15) (Exhibit #24)

54.     March 18, 2020. Defendant Whipple posted a pre-recording video with embedded captions to share that he is "going to be working from home" and how he will attend his meetings through digitals means. (10-12) He adds that he is "going to keep you guys updated like i've been doing uh through videos like this". (12-13) (Exhibit #25)

55.     March 24, 2020. Defendant Whipple, while seated, introduces himself as "your mayor" to answer questions about the COVID-19 and what the City is doing. (4-7) He solicits for the questions to be posted as comments. (9-11) He shares that the

audience and himself will get "really good at this type of Technology" in order to have meetings like this regularly. (16-17) Over the next 45 minutes, he shares critical health and safety information for the public to benefit from, educates the public about the authority of his position as the mayor, and explains about the consequences of not following the stay at home order. In response to a question about the homeless, he explains what the City is doing about it. (233-274) (Exhibit #26)

56.     March 26, 2020. As a short pre-recorded video from his mayor's office, Defendant Whipple discusses the county's stay-at-home order and urges his audience to follow it. Health and safety guidelines are explained as well. Upon stopping the streaming, he addresses the audience "as your mayor" and thanks "wichita". (14-19) (Exhibit #27)

57.     March 29, 2020. While seated and live streaming, Defendant Whipple discusses the COVID-19 pandemic situation, the responses from a variety of local, state, and federal level authorities, and solicits audience questions. There are very important health and safety information shared in this video. (Exhibit #28)

58.     April 2, 2020. Defendant Whipple, standing outside at the city hall, provided critical information about the City's response to the COVID-19 pandemic. In addition, he discussed about the furloughed employees. Lastly, he provided detailed instructions as the mayor. He calls those weekly meetings that are posted on his campaign's Facebook page as "weekly press conferences". (5-7) (Exhibit #29)

59.     April 3, 2020. While seated in his office and live streaming, Defendant Whipple detailed COVID-19 and provided instructions for dealing with it. Additionally, he discusses his ability to deal with the pandemic as mayor. He answered several

questions from the audience on these topics because of saying, "ask me anything i work for you you know me as the mayor you're my boss so of course i will address anything that you know people might have as a question". (247-249) He also says about getting better at technology and "to have constant communication with you know the public and also with me my job is to get briefed on some of the stuff that's happening both at the state level and both at the local level and then relay that information to you guys". (308-315) "[I]f we're not facebook friends make sure you follow my page [ … ] go ahead and follow that page and i will be keeping that page up to date uh with as much information as i get because i want to keep you guys informed". (326-329) (Exhibit #30)

60.     April 13. 2020. In a live stream when seated, Defendant Whipple says he wants "to explain what's happening currently uh with our social distancing also with what you know any of the other stuff going on at city hall". (8-10) He discusses what's happening with the city council and what's going on all over the city about COVID-19. He goes in depth about his job as the mayor. (130-159) After discussing how City employees struggle to file for unemployment, he goes into detail about how the state is involved. (226-265) (Exhibit #31)

61.     July 18, 2020. While live streaming when seated, Defendant Whipple discusses the COVID-19 pandemic that is going on around the City throughout this video. He details about how he does his duty regarding ordinances. (151-216) (Exhibit #32)

62.     July 25, 2020. While live streaming when seated, Defendant Whipple made himself available to answer questions and for the public to "express your thoughts and opinions uh with the mayor". (33-34) Furthermore, he discusses the county's COVID-19

order for bars and nightclubs. In addition, he goes into detail with critical health and safety information regarding the pandemic. He closes the video off by thanking "you all for being on um my weekly uh my weekly town hall". (654-655) (Exhibit #33)

63.     August 1, 2020. While live streaming when seated, Defendant Whipple starts off by saying he plans to talk about the budget, COVID-19, and solicits for questions before explaining about his streaming set up. More specifically, he discusses about the process of the City handling with their police department and animal control department. Plaintiff Haulmark requested captions, but Defendant Whipple explains why he cannot provide them and solicits for assistance. (462-472) While being dismissive toward Plaintiff Haulmark, he moves onto other City-related matters. (Exhibit #34)

64.     August 8, 2020. In a live stream when seated, Defendant Whipple updates the audience on critical COVID-19 health and safety information. He discusses about the City's meeting with domestic violence shelters to answer a question from the audience. (348-385) He discusses about a business license fee as his proposal. (610-736) (Exhibit #35)

65.     August 15, 2020. While live streaming when seated, Defendant Whipple explains in depth the City's response to the COVID-19 pandemic. He covers other City-related matters including how he is doing his job as the mayor. (Exhibit #36)

66.     August 22, 2020. Defendant Whipple begins his live streaming when seated with discussion on his set up and encourages people to move over to use his campaign's Facebook page. He provides the updates about COVID-19 and other City-related matters. He acknowledges that he has been providing information to a

member of the audience as the mayor. (246-248) He provides critical health information involving the vaccines. (443-510) (Exhibit #37)

67.     August 29, 2020. When seated and live streaming, Defendant Whipple provides health and safety information regarding the COVID-19 pandemic. He discusses about his work with the council and the City's budget. He explains about why it's important to use the social media platform as a mayor. (568-611) (Exhibit #38)

68.     September 5, 2020. Defendant Whipple, seated while live streaming, starts off by discussing about his streaming set up. He calls his campaign Facebook page as the official page. (21-38) He discusses about his job involving the city manager. (41-108) He acknowledges and responds to Plaintiff Haulmark's request for captioning but his response is only for those who are able to hear. (109-129) He moves on to discuss about what he's been doing while being on his job. Then he repeats about acknowledging that the Deaf community is excluded from his live streaming videos. (439-453) While trying to dismiss the Deaf community's need for access, he tells the Deaf community to go to the "official page official city page to be rude" and that "this is my personal stuff". (456-484) Then he goes on discussing about the bus system within the City. (496-578) (Exhibit #39)

69.     September 12, 2020. Defendant Whipple, while live streaming when seated, calls his campaign's Facebook page an official page. (53-57) He discusses on the resistance from the community regarding the mask mandate policy. He discusses about City-related matters including asking the City's legal department and getting response about members of public from outside of Wichita coming in to share comments.

(219-248) In the remainder of the video, he discusses health and safety issues related to the COVID-19 in collaboration with the City. (Exhibit #40)

70.     September 26, 2020. While streaming live for the audience when seated, Defendant Whipple updated the audience on COVID-19. There were some City-related matters involved in this update. (Exhibit #41)

71.     October 3, 2020. After beginning to stream live while seated, Defendant Whipple discusses the City's partnership with Newman University, Sally Stang as the director of the City's housing department, as well as the homeless population and available social services. He explains about the masking mandatory requirements as the mayor. (287-364) He responds to a question about what the City can do about motorcycle accidents. (364-380) (Exhibit #42)

72.     October 10, 2020. Defendant Whipple discusses "what we did at the city" after the three-minute mark when he's seated and live streaming. (42-43) Defendant Whipple includes discussion about small businesses, economic recovery, involvement of the federal government, health department of a county, COVID-19 and flu shots, and what the city council is interested in. (Exhibit #43)

73.     October 17, 2020. As Defendant Whipple invites the audience to "ask questions about the city and to also um and to also be able to interact and have updates", he is seated while streaming this live video. (21-23) He discusses one of the City's councils overseeing the arts and culture. (78-114) The COVID-19 mask mandatory policies and health information are explained in detail by him. He discusses on Amazon coming to a region of the City and about the transportation within the City. (427-499) (Exhibit #44)

74.     December 19, 2020. While seated, Defendant Whipple streams a live video on the new council on diversity, inclusion & civil rights. (93-154) He also discusses the $800,000 being set aside to help the Wichita Family Crisis Center to purchase a new facility. (252-263) He also answers a question about reforming the police department. (271-324) He closes the video off with ""thank you all for uh being on the video with us today and for staying informed and being really a part of moving wichita forward by communicating with me and with other members of the council". (471-774) (Exhibit #45)

75.     December 26, 2020. In a live stream while seated, Defendant Whipple said, "the goal is to have as many people staying up to date on what's happening at city hall and really you know throughout our community as possible and to get more more folks engaged in this discussion". (7-9) He discusses the legality of hunting coyotes within city limits. (98-113) He also discusses possible ethical reform of the local government. (306-475) (Exhibit #46)

76.     January 9, 2021. In a live stream while seated, Whipple provided COVID-19 updates, including the governor's office conference call about vaccine distribution and rollout phases. (66-178) (Exhibit #47)

77.     January 23, 2021. Defendant Whipple live streams while seated and encourages his audience to share the video on the campaign's Facebook page page "so that folks in their network can join the conversation and get an update what's happening at city hall". (30-31) He discusses COVID-19 updates, including the impact on hospitals and their staff and the distribution of the vaccines. (479-567) He goes on discussing about homeless and domestic violence shelters. (611-641) (Exhibit #48)

78.     April 10, 2021. Defendant Whipple introduced himself as "mayor brandon whipple" after he begun his live streaming video while seated. (3) He shares "this also is my campaign page this is technically a campaign activity and it's like that uh because uh i have i'm at home i'm not at city hall and i want to be really just just honest and open with folks during these discussions so this isn't a extension of the city government nothing that we interact with that has been approved by our city um communications team who are great people um but i do want to put that out there this is uh us as mayor talking to folks who have questions um just one-on-one i'm allowed more freedom when it comes to utilizing my own personal assets such as um this page versus a city page" (60-67) He provided COVID-19 updates including distribution of vaccine. (88-256) Next, he discusses Amtrak and the possibility of attracting people to the City. (256-432) He then briefly discusses upgrading the City's bus system. (437-442) He shifted his focus onto ethics reform being a potential ordinance. (442-747) He solicits for feedback on some proposed changes. (844-845) (Exhibit #49)

79.     August 7, 2021. Defendant Whipple, while seated live streamed to provide some updates after attempting to claim how he does not utilize his campaign's Facebook page on the behalf of the City as the mayor. (28-56). He shares that "we had a very uh robust week over at city hall" and more including the meetings and budget changes. (57-100) He discusses about the police department dealing with "massive speeding in wrecks on wichita roads" after being asked about it. (236-249) Regarding the distribution of information on COVID-19 and vaccines, he admits that he "use my my outreach resources to actually get that information out […] because i'm the mayor getting out the information that the county is doing that we have a bigger role at the

city level". (259-263) The next part of the video provides extensive information about health and safety. He discusses how the City recently purchased a new building to serve as a homelessness prevention, mental health, and domestic violence center. (341-361) He discusses in depth on "the fire department move with the police department to the new station". (364-396) He discusses about how the City deal with homelessness as a response to a question from a member of the public. (405-496) He is asked a question about how the infrastructure bill would help the City. (496-500) He provides the response to the previous question. (500-523) (Exhibit #50)

80.     September 25, 2021. Defendant Whipple live streamed while seated and made a claim, "we're still gonna have a good discussion today if you are new to this um pretty much what we do with these live chats is this is me at my house on my personal facebook or my campaign facebook page which means that this isn't really a city hall uh sanctioned discussion uh which means i can answer any questions at all i'll say whatever i want and it's on behalf of myself as mayor not as um as the city i guess or official stance with the city allows us a little more flexibility of what we talk about so feel free to post whatever". (Exhibit #51)

81.     September 3, 2022. Defendant Whipple live streamed while seated to discuss a new manufacturing plant that will produce popular hand-held snack pies that will create "about 150 new jobs here in wichita it's about 40 million dollars of private investment going into our local economy and as councilmember balor just just checked in and said good morning" (40-87) He replies to a comment requesting an interpreter by attempting to separate himself from the City. (111-168) He goes on performing his

mayoral duties by sharing details about the "51 million dollars in buildback better grand funding" from the Biden administration. (171-178) (Exhibit #52)

**F.      City's Facebook page**

82.     Not all online videos on the City's Facebook page have captions. (¶ 20 in Haulmark's Affidavit; Exhibit #18)

83.     For City's Facebook page, there are not any notices with directions to accessible content, which offers the same benefits as inaccessible content. (¶ 20 in Haulmark's Affidavit)

84.     Many of the captioned online videos are missing four of the benefits that individuals without a hearing disability are able to take advantage of. (See ¶ 20 in Haulmark's Affidavit; ¶¶ 134-138 below)

**G.      City of Wichita YouTube channel**

84.     For City of Wichita YouTube channel using automated captioning services, Plaintiff Haulmark are denied access to four of the benefits that the individuals without hearing disabilities are able to take advantage of. (¶ 20 in Haulmark's Affidavit; Exhibit #20; ¶¶ 134-138 below)

85.     For City of Wichita YouTube channel, there are not any notices with directions to accessible content, which makes the offered inaccessible benefits to be accessible for individuals with hearing disabilities. (¶ 20 in Haulmark's Affidavit)

86.     A video on Johnson County's YouTube channel is properly captioned to make the four benefits accessible for the individuals with hearing disabilities by making the information concise, clear, and fully understood with precise identification of

speakers. For reviewing purpose, an exhibit of a transcript from one of the Johnson

County's videos is attached. (Exhibit #21)

## IV.   TRANSCRIPTS OF ONLINE VIDEOS ON DEFENDANT WHIPPLE'S CAMPAIGN FACEBOOK PAGE

87.     In order to produce these transcripts for selected videos[5], Plaintiff

Haulmark used YouTube's automatic captioning service after being suggested by

Defendant Whipple. (Response To Plaintiff's Motion to Review Magistrate's Order at 6)

(Docket No. 40) ("All can be downloaded to YouTube, where they are then closed

captioned.")

88.     YouTube's automatic captioning services do not include proper

punctuation, speaker identification, or accurate pronunciation of spoken dialogue. The

only person speaking and responding to the camera in these selected transcripts is

Defendant Whipple, as shown in the screenshots generated from the selected videos.

89.     The selected videos were downloaded from Defendant Whipple's campaign

Facebook page and uploaded to a YouTube channel. The YouTube's automatic captioning

services finished captioning all these videos after a few days. To show what is being

spoken by Defendant Whipple, Plaintiff Haulmark downloaded all of those captions into

transcripts, then he generated screenshots of the same videos.

90.     All of these unmodified transcripts and screenshots are attached as

Exhibit #22-52.

91.     As the context of the transcripts is to be reviewed on the surface,

Defendant Whipple shares insider information about what's happening in the City's

---

[5] Plaintiff Haulmark chose not to include over a thousand pages of transcripts for all the Facebook live videos published on the campaign's Facebook page, but only enough to show that the mayor's office offers the City's benefits through that page to raise genuine issue of fact and defeat Defendants' motion.

hall, with its internal affairs, and with its official actions. He has a pattern of reading the comments out loud and then responding as he streams himself.

## V.    STATEMENTS OF ISSUES

92.    Defendants are asking this Court to decide that the "Defendants cannot be held liable under Title II of the ADA based only on social media content posted on Defendant Whipple's personal campaign Facebook page" and that "Defendant City has provided reasonable accommodations for its own Facebook and YouTube pages." (See Defendants' Memo at 4)

93.    As a result of the Court's answers to Plaintiff Haulmark's below questions, the Court will reveal that the Defendants are liable for the actions of their mayor on his campaign's Facebook page, and the City has failed to establish effective communication with Plaintiff Haulmark and other individuals with hearing disabilities on their social media platforms.

94.    Under Title II, would Defendant Whipple be able to offer services, programs, and activities as the benefits of the City through the campaign's Facebook page? Are there any criteria that must be met if so?

95.    In deciding if the accommodations for the Facebook pages and YouTube channel are reasonable, were they adequate to provide Plaintiff Haulmark with effective communication as required under Title II? If not, did the Defendants fail to make reasonable modifications to establish effective communication with Plaintiff Haulmark?

## VI.    ARGUMENT AND AUTHORITIES

**The Pleading Requirements of Rule 8 of the Federal Rules of Civil Procedure**

96.     Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint "must contain . . . a short and plain statement of the claim showing that the [plaintiff] is entitled to relief."

97.     Plaintiff Haulmark has stated a cognizable claim in this Court by identifying the specific claim he is asserting with the specific factual allegations that support his claim, and what each Defendant did that allegedly violated his rights.

**Summary Judgment Standard**

98.     Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); See also *Celotex Corp. v. Catrett*, 477 U.S. 317, at 322 (1986). This Court must view the evidence and draw inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, at 378 (2007). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, at 248 (1986). An issue of fact is "material" if it has the ability to "affect the outcome of the suit." See *Id.*

**Summary of the Defendants' argument against Plaintiff Haulmark's ADA Cause of Action**

99.     The Defendants argue that Plaintiff Haulmark "offered two theories to satisfy the public entity element of their ADA cause of action." See Defendants' Memo at 6.

100.    A number of points from Plaintiff Haulmark's complaint are cited by the Defendants in their discussion of Plaintiff Haulmark's first theory, including how

Defendant Whipple is allegedly conducting his mayoral duties on his campaign's Facebook page. See *Id* at 6-7.

101.    In the second theory, the Defendants highlight how their role isn't a proactive one, but rather a reactive one when it comes to compliance with Title II when knowing that the wide audience of individuals with hearing disabilities needs meaningful access to their online videos on social media platforms. They also point out that Plaintiff Haulmark has alleged that they have failed to provide reasonable accommodations on their social media platforms. See *Id* at 7. They assert that Plaintiff Haulmark is ignoring the supposed reasonability of the automatic captioning services, provided by Facebook and YouTube, "without any support for the contention that such accommodations are unreasonable." See *Id*. The previous argument is same for "additional accommodations in place[.]" See *Id*.

102.    Plaintiff Haulmark has alleged in his Complaint and other pleadings that Defendant Whipple invokes his mayor status[6] to influence the behavior of those around him to garner such public engagement on his campaign's Facebook page on the behalf of the City. Additionally, he shared and discussed extensively with one of his videos[7] on his campaign's Facebook page about what was happening within the city, which a non-official person from outside would not be able to do.

103.    When trying to explore the relationship between Defendant Whipple's campaign and the City, Plaintiff Haulmark has been barred from conducting discovery on the campaign's Facebook page. Otherwise, Plaintiff Haulmark would have been able to gather and present evidence to show that the mayor of the City is utilizing the same

---

[6] ¶ 51,59 in this Opposition
[7] ¶ 58 in this Opposition

page in his official capacity, which would, in turn, be covered by Title II of the ADA, which is a broad, comprehensive, remedial law. See Magistrate Judge's Order (Docket No. 35) & District Judge's Order (Docket No. 43).

104.    The Defendants are currently exploiting these erroneous decisions to support their mayor's ability to continue freely discriminating[8] against Plaintiff Haulmark and other individuals with hearing disabilities when carrying out these official duties. This is after encouraging this Court to construe the ADA so narrowly to determine that the campaign's Facebook page is irrelevant to discovery because it is a purely private sphere. See Defendants' Memo at 7-8.

105.    Although the Defendants ignored and failed to address the effective communication provision of Title II throughout their motion, Plaintiff Haulmark has already alleged why these automatic captioning services are unreasonable. (¶ 45 in Complaint). No showing has been made by the Defendants to challenge this allegation in Defendants' Memo.

106.    The original complaint of Plaintiff Haulmark alleges that Defendants Whipple and the City of Wichita discriminates against him in several ways that constitute violations of the ADA. The City had failed to hold its affirmative obligations to ensure that their services, programs, and activities are provided with meaningful access for the individuals with hearing disabilities. The City fails to make requested reasonable modifications to its policies, practices, or procedures to avoid discrimination based on Plaintiff Haulmark's disability. See ¶ 56 in Complaint. This includes intentionally excluding Plaintiff Haulmark from many of the services, programs, and

---

[8] ¶ 68 in this Opposition

activities offered by both Defendants. Furthermore, the Defendants fail to provide adequate notice of accessible locations offering meaningful access where individuals with hearing disabilities can seek and access inaccessible benefits currently available to individuals without a hearing disability. In addition, Plaintiff Haulmark is intentionally subjected to discrimination on the basis of his disability by unnecessary policies, practices, procedures, criteria, or administration methods.

107.   These allegations state a claim under Title II of the ADA. The requested reliefs are available to remedy all of these violations and to cease the harm to Plaintiff Haulmark.

**The Majority of the Content Posted to Defendant Whipple's Campaign Facebook Page Falls Squarely Within Title II of the ADA**

108.   A significant amount of focus by the Defendants pertaining to the campaign's Facebook page is spent on the Magistrate Judge's ruling, in which Title II was not applied to its full extent as intended by Congress. When attempting to support his Title II claim, Plaintiff Haulmark was incorrectly instructed to identify a required third element under the Section 1983 as a "law clearly establishing when an individual government official's social media profile becomes a public forum." *Swanson v. Griffin*, No. 21-2034, 7 (10th Cir. Feb. 25, 2022) Instead, the Magistrate Judge erroneously failed to recognize that the text of Title II does not provide a basis for distinguishing the locations in which a public entity is involved, whereas the Defendants does not dispute that the Facebook page of the mayor's campaign within contains government speech and activities as the offered benefits[9] coming from the mayoral office of the City. *Townsend v. Quasim*, 328 F.3d 511, at 517 (9th Cir. 2003) ("If services were determined

---

[9] ¶¶ 51-81 in this Opposition

to constitute distinct programs based solely on the location in which they were provided, *Olmstead* [*v. L. C*, 527 U.S. 581, 119 S. Ct. 2176 (1999)] and the integration regulation would be effectively gutted.")

109.    Prior to Magistrate Judge's ruling, Plaintiff Haulmark has presented partial evidence regarding how a defendant invokes his public official status in a private sphere, administered by the same defendant, with the intention to offer municipal benefits "directly or through contractual, licensing, or other arrangements." See 28 C.F.R. § 35.130(b)(1). When determining Plaintiff Haulmark's motion to compel discovery on Defendant Whipple's Facebook campaign page, Plaintiff Haulmark's offered partial evidence did not seem to be properly contextualized to take into consideration how Defendant Whipple is carrying out his official duties on his campaign's Facebook page. Unjustly, this Court appears to have accepted the Defendants' argument that private Facebook pages are absolutely exempt from coverage of Title II of the ADA. As predicted, the Defendants are exploiting this erroneously ruling in an attempt to freely wield discrimination as a sword.

110.    The U.S. Supreme Court instructed that statutes such as the ADA must "be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." See *Corley v. United States*, 556 U.S. 303, at 314 (2009) (Cleaned up). It is contrary to the decision of this Court, with all due respect, when it accepted the Defendants' argument that Title II of the ADA is to be limited by any private Facebook pages.

111.    The Defendants cite a 10th Circuit case in their motion to show that Plaintiff Haulmark "must plausibly allege that (1) he is a qualified individual with a

disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." See Defendants' Memo at 6 (Citing *Robertson v. Las Animas Cnty. Sheriff's Dept.,* 500 F.3d 1185, at 1193 (10th Cir. 2007)).

112.    Title II of the ADA commands that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

113.    Considering the offering of the benefits from a mayor on the campaign's Facebook page, "no qualified individual with a disability shall, by reason of such disability, be [...] denied the benefits of the services, programs, or activities of a public entity[.]" See first clause of *Id*. Regardless of where the benefits are offered, they must be made available by any public officials or employees of the public entity in order for Title II to apply fully. See 28 C.F.R. § 35.102(a).

114.    Through the City's Youtube channel as one of the City's official communication platforms, Defendant Whipple announced to the public that he's offering the City's benefits on his campaign's Facebook page[10].

115.    When Defendant Whipple posts on his campaign's Facebook page, he clearly invokes his mayor status, which is where the Defendants spend a considerable amount of time asserting with a defense of his campaign Facebook page being a private sphere.

---

[10] ¶ 30 in this Opposition

116.    In his official capacity as the mayor receiving an annual salary from the City, Defendant Whipple has admitted[11] that he is serving the general public through his campaign's Facebook page instead of through the City's Mayor of City of Wichita Facebook page for the benefit and convenience of the general public when performing his official duties, work, or business facilitated by his mayoral office. See *Hamer v. City of Trinidad*, 441 F. Supp. 3d 1155, at 1170 (D. Colo. 2020) (A sister court defined "service to mean the performance of work commanded or paid for by another; an act done for the benefit or at the command of another; the provision, organization, or apparatus for meeting a general demand; the duties, work, or business performed or discharged by a public official; and defined public service to mean work provided or facilitated by the government for the general public's convenience and benefit.") (Citing *Frame v. City of Arlington*, 657 F.3d 215, at 226, 25 A.D. Cas. 556, 43 NDLR P 228 (5th Cir. 2011)) (Cleaned up).

117.    Defendant Whipple admitted that he has designated his campaign's Facebook page as a channel of communication for his role as the mayor to be in "constant communication"[12] with the public. Because of his refusal to provide reasonable accommodations, there is no meaningful access provided to the individuals with hearing disabilities.

118.    The Defendants appear to continue confusing this Court about Plaintiff Haulmark's allegation on whether if a Facebook page is framed as a service, program, or activity of a public entity pursuant to Title II. See Defendants' Memo at 12-13. In the wake of a natural disaster that destroys majority of his city's property and city hall, a

---

[11] ¶¶ 58-59, 66, 68, 78, 80-81 in this Opposition
[12] ¶ 59 in this Opposition

mayor may arrange for his public briefings to be temporarily conducted in a large barn, capable of seating hundreds of people, on his private property so that he can invite and engage with a large audience of the public that is interested in what is happening in the same city. Under Title II, this barn does not qualify as a city's service, program, or activity, but rather as a location where the city is to offer *within* to the public its benefits at its mayor's discretion. This public briefing services is be framed to be a benefit of a municipality that is *offered* by a public official dressed for his mayor role on his campaign's Facebook page. *Williams v. Colo. Dep't of Corrs.*, No. 22-1033, at 6 (10th Cir. Aug. 25, 2022) (Discussing how the Supreme Court clarified the meaning of services, programs, and activities as well as their applicability to public entities.)

119.    A public official cannot escape to a private sphere such as his barn or a campaign's Facebook page to evade the coverage of Title II of the ADA when engaged in the performance of his official duties to serve the public. The realities of 21st century interactions, including those brought about by the COVID-19 pandemic as well as the use of social media platforms, further confirm that Title II addresses a provision of information and services by government and its officials through its websites and other means of electronic information exchange. See *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, at 2097 (2018) (Noting "the physical presence rule [...] must give way to the far-reaching systemic and structural changes in the economy and many other societal dimensions caused by the Cyber Age.") (Internal quotation marks omitted)

120.    For the benefit of the City's residents and others including political activists, Defendant Whipple intentionally made arrangements between his campaign

and his office of the City to utilize the Facebook page of his campaign[13] for the dissemination of official statements and to solicit for the public to respond accordingly, normally performed by a mayor. Those are the municipal benefits that Plaintiff Haulmark and others with hearing disabilities are entitled to but have been denied or excluded from because of their disabilities.

121.   When Defendant Whipple uses his campaign's Facebook page to serve the public while working outside his office within the scope of his authority as mayor, his communication and activities constitute and represent the output of a public entity. The Tenth Circuit ruled that the term activity captures "all the outputs the public entity provides to the public it serves[.]" See *Elwell v. Okla. ex rel. Bd. of Regents of Univ. of Okla.*, 693 F.3d 1303, at 1307 (10th Cir. 2012)

122.   As another example of Title II's application, "no qualified individual with a disability shall, by reason of such disaiblity, [...] be subjected to discrimination by any such [public] entity." See second clause of 42 U.S.C. § 12132. "A public entity may not, directly or through contractual, licensing, or other arrangements" discriminate against individuals on the basis of disability. See 28 C.F.R. § 35.130(b)(1). In addition, a public entity "may not directly or through contractual or other arrangements, utilize criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." See 28 C.F.R. § 35.130(b)(3)(i).

123.   "A public entity shall make reasonable modifications in policies, practices, or procedures when the modification is necessary to avoid discrimination on the basis of

---

[13] ¶¶ 30, 32-40, 42, 51, 53-55, 58 (calling them weekly press conferences), 59, 78 (approved by communication team of the City), 79-80 in this Opposition

disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity." See 28 C.F.R. § 35.130(b)(7).

124.    By arranging with Defendant Whipple's campaign to offer services, programs, and activities on behalf of the City against the backdrop of the COVID-19 pandemic, the City has been capable of avoiding and prohibiting discrimination against individuals with hearing disabilities.

125.    Rather, the City failed to meet its affirmative duty under Title II to develop and enforce a sweeping antidiscrimination policy requiring all of its public officials and employees to use social media platforms designated by their offices within the City when performing or carrying out their duties and serving the public. For individuals with hearing disabilities, these benefits should be made available in accessible formats when offered by individuals on private social media platforms if they are acting in their official capacities. By doing this is to eliminate or avoid discriminating against individuals with hearing disabilities.

126.    The City knew of Defendant Whipple's arrangement for its mayor's official duties taking place on the campaign's Facebook page[14]. On the campaign's Facebook page, the City knew that Defendant Whipple uses the badge of his mayoral authority signifying his intention to serve the public. The City knew Defendant Whipple used a discriminatory criterion to exclude individuals with hearing disabilities on the campaign's Facebook page by denying them the benefits that are offered to others without hearing disabilities[15].

---

[14] ¶ 78 in this Opposition
[15] ¶ 68 in this Opposition

127.    Despite being notified by Plaintiff Haulmark and the Kansas Association of the Deaf[16] of the discrimination that is caused by its mayor against individuals with hearing disabilities, the City refuses to make the reasonable modifications to its policies, practices, procedures, or customs in order to avoid subjecting Kansans with hearing disabilities to the same discrimination, nor does it ensure the same policies, practices, procedures, training, or supervision otherwise take the needs of the Kansans with hearing disabilities into account. See *Tyler v. City of Manhattan*, 857 F. Supp. 800, at 819 (D. Kan. 1994) (This Court determined that Title II prohibited a city from requiring disabled individuals to request keys for accessing accessible restrooms in leased buildings. This Court also ordered that any city-sponsored ball games be relocated to accessible fields within 30 days; modifying the steel barricade that made the park inaccessible to people with disabilities; and preventing the use of any recreational programs or activities at inaccessible fields until they have been modified to make them accessible to individuals with disabilities).

128.    The City of Wichita may not delegate its affirmative duties to private entities such as Defendant Whipple's campaign to ensure compliance with Title II of the ADA. Title II of the ADA does not cease to apply just because a public official is campaigning while performing his or her official duties simultaneously.  28 C.F.R. §35.130(b)(3)(i)

129.    As a result of hiding behind Defendant Whipple's campaign and ignoring its own independent responsibility to ensure accessibility and compliance required by

---

[16] ¶ 24 in this Opposition

Title II, the City of Wichita intentionally allowed Plaintiff Haulmark to be subjected to discrimination by the reason of his disabilities.

130.    The Defendants assert "Kansas state campaign finance law at K.S.A. 25-4169a prohibits the City from providing services or funds in support of any political candidate's personal campaign." See Defendants' Memo at 2. Accordingly, this argument is without merit and does not absolve the City of its obligations under the ADA. The Kansas Government Ethics Commission issued a September 28, 2011 opinion regarding the use of official vehicles by county sheriffs and deputy sheriffs for campaign events and activities. (See Exhibit #9) ("No officer or employee of the state of Kansas, [or] any county . . . shall **use** . . . public vehicles . . . of any such public agency . . . for which the officer or employee is compensated by such governmental agency, **to expressly advocate** the nomination, election or defeat of a clearly identified candidate to . . . local office." (Emphasis retained) The City does not **expressly** advocate Defendant Whipple's campaign in its upholding of Title II when the mayor carries out his official duties when meeting with the public on his campaign's Facebook page. It is also important to note that the supremacy clause is relevant here.

131.    According to the Defendants, if the Court decides that the official duties of City's mayor are subject to Title II outside of their usual designated channels of communication, the other public officials of different public entities would be subject to the same law. As the ADA was enacted by the Congress, it serves as a shield for individuals with disabilities, not a sword to attack public entities and their public officials.

132.   It is the City of Wichita's required duty to coordinate measures with Defendant Whipple's campaign to develop a plan to establish effective communication with Plaintiff Haulmark and other individuals with hearing disabilities to avoid subjecting them to discrimination on the basis of their disabilities. As an example to offer same benefits to the public as from the campaign's Facebook page, Defendant Whipple should have live streamed his public briefings on the Mayor's Facebook Page controlled by the City, with a design to make the online videos accessible for the individuals with hearing disabilities, and make himself available to answer any questions from the public, including the individuals with hearing disabilities. His communication should be as effective with the individuals with hearing disabilities as those others without a hearing disability.

133.   It is in his complaint that Plaintiff Haulmark seeks an injunction relief to compel the City to take these "legally-required steps to prohibit discrimination against Plaintiff Chris Haulmark and other individuals with hearing disabilities." See Complaint at 1. Plaintiff Haulmark thus has standing necessitating the requested reliefs, including an injunction preventing any further harm.

**Automatic Captioning Services Do Not Establish Effective Communication With Individuals With Hearing Disabilities.**

134.   A video published by a government would provide at least four benefits to individuals without hearing disabilities: 1) full content, 2) identification of speakers, 3) understanding whether a statement is being made or a question is being asked, and 4) immediate access to the content. In its online videos, the City offers these four benefits to individuals without a hearing disability when sharing announcements, responding to inquiries, providing vital health updates, dealing with ordinances and local regulations,

soliciting for public input, and discussing important city matters. See *Martinez v. Cuomo*, 459 F. Supp. 3d 517 (S.D.N.Y. 2020).

135.    One of the benefits the City's online videos offer to individuals without a hearing disability is the full context of the information being spoken.

136.    Knowing which dialogue belongs to which speaker is different from knowing the full context of the information contained in a video. As this second benefit, it is possible to identify the speaker's gender by the voice when a speaker is not visible in the video. Therefore, a video with multiple and/or nonvisible speakers offers at least two benefits to individuals without a hearing disability-- full context of the information and identification of the speakers.

137.    Furthermore as the third benefit, individuals without a hearing disability have access to determine whether a spoken dialogue is a statement or a question by hearing the pitch of the speaker's voice. Individuals who are fluent in American Sign Language ask a question by raising their eyebrows, widening their eyes, and tilting their bodies forward-- a third benefit made available by a sign language interpreter for individuals with hearing disabilities using sign language. *Taylor v. State*, 226 Md. App. 317, at 351 (Md. Ct. Spec. App. 2016) When there is a question mark at the end of a sentence according to English grammar and punctuation rules, it indicates that the spoken dialogue is a question-- the third offered benefit required to be accessible for these who require captioning.

138.    Lastly as the next benefit, the individuals without a hearing disability have immediate access to these previously listed benefits upon posting of the videos. Instead, the City invoke criteria that have a particular exclusionary effect on Plaintiff

Haulmark and other individuals with hearing disabilities. This exclusionary effect can be avoided if professional captioning services are properly utilized to ensure communication accessibility is guaranteed to be available at the time when videos are posted. The requirement to notify the City for each time a video fails to be captioned by the automatic captioning system constitutes discrimination against the individuals with hearing disabilities.

139.    As an individual with hearing disabilities, Plaintiff Haulmark requires reasonable modifications to be made to the online videos so he can obtain accurate, complete, and timely information from identified public officials and employees within Kansas just like any other individuals without a hearing disability in order to effectively serve the Deaf Kansans in order to improve his and their lives. Otherwise, Plaintiff Haulmark is intentionally denied from any of these offered benefits based on his disability.

140.    There is no specific technological captioning regime that Plaintiff Haulmark wishes to impose on the Defendants' social media platforms as long as the Defendants make these listed benefits accessible through their online videos.

**The City Does Not Establish Effective Communication on Their Social Media Platforms as Required by Title II of the ADA**

141.    As explained by the Supreme Court, there is a "difference between affirmative action and reasonable accommodation; the former is said to refer to a remedial policy for the victims of past discrimination, while the latter relates to the elimination of existing obstacles against the handicapped." *Alexander v. Choate*, 469 U.S. 287, at 301 n.20 (1985)

142.    As far as the Defendants' own Facebook pages and YouTube channel are concerned, they argue that they made reasonable accommodations for their online videos. However, this city-wide commitment to accommodate individuals with hearing disabilities is not governed by an unambiguous antidiscrimination policy to mandate its employees to ensure the City complies with the ADA law.

143.    For some of their videos, the City admits that it relies on Facebook and YouTube's free automatic captioning services. The City also admits they acquired a third-party captioning service for some of the different online videos. The City also admits some online videos remain without captioning[17] or other accommodations.

144.    Evidently, the City failed to take affirmative action as required by Title II to ensure there are meaningful access for individuals with hearing disabilities for all of its online videos. Therefore, the City has failed to institute reasonable accommodations sufficient to provide the individuals with hearing disabilities with meaningful access on their social media platforms.

145.    Aside from the claim that some videos on the City's social media platforms do not have captions or any other reasonable accommodations, Plaintiff Haulmark alleges in his Complaint that the current automatic captioning services produce incomprehensible captions for the current online videos on the City's social media platforms, similar to setting up a sign language interpreter in a dark room without adequate lighting. As a result, this failure leads to denying individuals with hearing disabilities from the same benefits as those available to individuals without a hearing

---

[17] ¶ 82 in this Opposition

disability. These benefits include clear, complete, and timely information from identified

public officials that to be provided to these individuals without a hearing disability.

146.    The online videos published by the Johnson County's Board of County

Commissioners establish effective communication for individuals with hearing

disabilities on their YouTube channel because the four important benefits of a

government's video are made accessible for the individuals with hearing disabilities.

The Johnson County's captioning services enable Plaintiff Haulmark to take advantage

of the same benefits as those without a hearing disability.

147.    Plaintiff Haulmark has requested[18] the City to implement the similar

captioning services to what Johnson County has been using when he engaged with

Defendant Whipple on the campaign's Facebook page. Again, the videos on Johnson

County's YouTube channel are properly captioned to make the information concise,

clear, and fully understood with precise identification of speakers[19]. For a reviewing and

comparison purpose, this exhibit is attached to show how Wichita has fails to establish

effective communication by making its offered benefits accessible to Plaintiff Haulmark

and others with hearing disabilities with their captioning services. (See Exhibit #20)

**The Only Defense Available Under Title II of the ADA Pertaining to the
Effective Communication Provision**

148.    Despite Defendants' request, the Court cannot exempt a private Facebook

page from from ADA coverage when containing municipal benefits offered by a mayor to

the public. By labeling a Facebook page as a private sphere simply by saying it's

personal or private is not a defense available under Title II when the same page

---

[18] ¶ 20 in Haulmark's Affidavit
[19] ¶ 86 in this Opposition

contains activities and speech of a public official carrying out their official duties on behalf of a public entity when serving the public.

149.    Once Plaintiff Haulmark establishes that Title II is applicable to all the contents on the Defendants' social media platforms, including Defendant Whipple's Campaign Facebook page, there is only one affirmative defense available: the undue burden.

150.    "To invoke the undue burden defense, the head of the public entity must make this decision after considering all resources available for use in the funding and operation of the service, program, or activity, and the decision must be accompanied by a written statement of the reasons for reaching that conclusion." *Hamer v. City of Trinidad*, 441 F. Supp. 3d 1155, 1172 (D. Colo. 2020) (Citing 28 C.F.R. § 35.150(a)(3)) (Internal quotation marks omitted)

151.    Upon discovery from the City, Plaintiff Haulmark has not received a written statement from the head of the City regarding its undue burden.

152.    The defense of an undue administrative burden might be available if Plaintiff Haulmark requests a sign language interpreter on a short notice during an unscheduled face-to-face meeting of the mayor with the public. Nevertheless, on social media platforms, the technology for captioning online videos is always available, so this is not an administrative hindrance.

## VII.   CONCLUSION

153.    In their motion, the Defendants are trying to murky the distinction between Defendant Whipple's personal and official actions on his campaign's Facebook page. According to Plaintiff Haulmark's presented facts and evidence in this Opposition,

Defendant Whipple is carrying out official duties on his campaign's Facebook page which constitutes as the City's services, programs, and activities under Title II.

154.    As illustrated by the arguments they offer in their motion, the Defendants fail to comprehend either the requirements of Title II of the ADA, or the components of Plaintiff Haulmark's claim. The City and Defendant Whipple's office are required to cease engaging in negative acts of disability discrimination in order to comply with Title II of the ADA, as well as take affirmative measures to prevent disability discrimination against disabled individuals. See 42 U.S.C. §§ 12131-12134; See also 28 C.F.R. pt. 35.

155.    In their motion, the Defendants fail to show that technological failures and vendor changes, as well as employee errors, will not lead to discrimination against individuals with hearing disabilities in the future.

156.    As Plaintiff Haulmark has demonstrated that the Defendants have stopped providing captioning or have failed to establish effective communication on their social media platforms, this Court must not decide that the Defendants have shown that it is impossible for the Defendants to continue violating the ADA. The remedies requested by Plaintiff Haulmark can redress this pattern that is likely to recur in the future.

157.    Plaintiff Haulmark shows that the Defendants have failed to comply with Title II of the ADA, resulting in harm to him. Plaintiff Haulmark has successfully satisfied all three of these required elements to support his ADA claim. *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, at 1295 (10th Cir. 2016) (Stating, in the context of a motion for summary judgment, "a viable claim [...] require[s] proof of the foregoing three elements").

For the foregoing reasons, Plaintiff Haulmark respectfully request that this Court deny

the Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment.

----------------------------------------------------------------

Respectfully submitted this 12th of
September, 2022

PLAINTIFF, *pro se*
chris@sigd.net
600 S. Harrison St
Apt #11
Olathe, KS 66061
512-366-3981

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2021, a true and correct copy of the above and
foregoing document was sent via email as an attached file in format of PDF to the clerk
of the U.S. District Court for the District of Kansas and to each of the following:

Erik S. Houghton,
455 North Main
13th Floor
Wichita, Kansas 67202
*Attorney for Defendant*
*City of Wichita*

Randall K. Rathbun
Depew, Gillen, Rathbun &
McInteer, LC
8301 E. 21st St., Ste. 4500
Wichita, KS 67206-2936
*Attorney for Defendant*
*Brandon Whipple*

/s/ChrisHaulmark
PLAINTIFF, pro se